UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RICHARD RAY PETERS and DREMA ("KATIE") G. PETERS,<br><br>Plaintiffs,<br><br>v.<br><br>THE ESTATE OF MUAMMAR MOHAMMAD ABU MINYAR QADHAFI and SAIF AL-ISLAM QADHAFI,<br><br>Defendants. | Civil Action No. 21-0516 (CKK) |

**MEMORANDUM OPINION**
(March 17, 2025)

Now pending before this Court is the Plaintiffs' [18] Renewed Motion for Default Judgment. The Court has received and considered Magistrate Judge G. Michael Harvey's [22] Report and Recommendation, which recommends that the Court deny the Motion and dismiss this case for lack of personal jurisdiction, and the Plaintiffs' [23] Objections to the Report and Recommendation. Upon consideration of the parties' submissions,[1] the relevant legal authority, and the entire record, the Court shall **OVERRULE** Plaintiffs' [23] Objections, **ADOPT** the [22] Report and Recommendation, **DENY** Plaintiffs' [18] Renewed Motion for Default Judgment, and **DISMISS** this action for lack of personal jurisdiction over Defendants.

---

[1] The Court's consideration has focused on the following documents, including the exhibits and attachments thereto:
- Plaintiffs' Amended Complaint ("Am. Compl."), ECF No. 5;
- Plaintiffs' Motion for Default Judgment as to Liability, ECF No. 16;
- Plaintiffs' Renewed Motion for Default Judgment, ECF No. 18;
- Plaintiffs' Redacted Proposed Findings of Fact and Conclusions of Law, ECF No. 19;
- Plaintiffs' Sealed Motion, ECF No. 20;
- Magistrate Judge Harvey's Report and Recommendation ("R&R"), ECF No. 22; and
- Plaintiffs' Objections to the Report and Recommendation, ECF No. 23.

Defendants, who are in default, have not responded. In an exercise of its discretion, the Court concludes that oral argument is not necessary to the resolution of the issues pending before the Court. LCvR 7(f).

1

## I. BACKGROUND

Plaintiffs Richard Ray Peters and Drema ("Katie") G. Peters filed this action against Defendants Muammar Qadhafi and Saif al-Islam Qadhafi, seeking damages under the Torture Victims Protection Act ("TVPA"). Compl., ECF No. 1. Plaintiffs later filed an Amended Complaint, substituting the Estate of Muammar Qadhafi as a party in place of the individual, who is deceased. Am. Compl, ECF No. 5.

In May 2021, the Court granted Plaintiffs' request to serve Defendants by publication. *See* ECF No. 8; ECF No. 11 at 2–3. Plaintiffs effectuated service by publication on July 14, 2021. ECF No. 19 at 8. Defendants failed to respond within the time allotted under the Federal Rules of Civil Procedure—indeed, to date, Defendants have failed to respond at all—and the Clerk entered default against both Defendants on November 8, 2021. *Id.* at 8–9; ECF No. 15.

In January 2022, Plaintiffs filed a Motion for Default Judgment as to liability pursuant to Federal Rule of Civil Procedure 55(b) and a Motion for Extension of Time to file proof of damages. Pls.' Mot. for Default J., ECF No. 16; Pls.' Mot. for Extension of Time, ECF No. 17. The Court denied Plaintiffs Motion for Default Judgment without prejudice because it "lack[ed] sufficient factual development to rule." Min. Order (June 29, 2022). Plaintiffs later filed a renewed Motion for Default Judgment, along with Proposed Findings of Fact and Conclusions of Law with exhibits. Pls.' Renewed Mot. for Default J., ECF No. 18; Pls.' Proposed Findings of Fact and Conclusions of Law, ECF No. 19. Plaintiffs filed certain exhibits and portions of the Proposed Findings of Fact and Conclusions of Law under seal to protect confidential medical information. Pls.' Sealed Exs., ECF No. 20. Thereafter, the Court referred the renewed Motion for Default Judgment to Magistrate Judge G. Michael Harvey for a Report and Recommendation. Order, ECF No. 21.

Magistrate Judge Harvey filed a [22] Report and Recommendation concluding that this case should be dismissed for lack of personal jurisdiction over Defendants. Plaintiffs filed timely

[23] Objections, specifically objecting only to Part III of the Report and Recommendation, spanning pages 7–23, which addressed the personal jurisdiction issue. Pls.' Objs., ECF No. 23.

No party has objected to Part I ("Background") or Part II ("Legal Standards") of Magistrate Harvey's Report and Recommendation. The Court therefore adopts and incorporates those Parts in full. *See* LCvR 72.3(c).

Because the underlying facts are essential to understanding this case and the analysis that follows, the Court reproduces Magistrate Judge Harvey's discussion of those facts here:

> Plaintiffs allege in their Amended Complaint that although Defendant Muammar Qadhafi held no official government title, he effectively served as the leader of the state of Libya from 1969 to October 20, 2011. ECF No. 5 ¶ 8. They allege that his son, Defendant Saif Qadhafi, also held no official government title but "served under the authority of Libya" and was "commonly referred to" as "the Libyan de facto Prime Minister." *Id.* ¶ 10.
>
> Plaintiffs . . . are both U.S. citizens, born in 1948 and 1959 respectively. ECF No. 19 ¶¶ 1–2. Mr. Peters enlisted in the United States Navy at the age of 18, and as part of SEAL Team Two and as a founding member of SEAL Team Six, he fought in Vietnam, Grenada, and Panama, and took part in numerous anti-terrorism missions. *Id.* ¶¶ 4–5. Mr. and Ms. Peters were married on August 24, 1985, and Mr. Peters retired and was honorably discharged from the U.S. Navy in 1990. *Id.* ¶¶ 6–7. After retirement from the military, Mr. Peters founded and ran two Coeur d'Alene-based construction companies, Associated Construction Management Worldwide ("ACMWW") and Global Security and Retrieval ("GSR"). *Id.* ¶ 9. ACMWW specialized in large-scale overseas construction projects in places like Iraq and Afghanistan, and GSR provided security services for large projects in the Middle East. *Id.* ¶¶ 10–11. As founder and President of both companies, Mr. Peters worked in both Iraq and Afghanistan during wartime. *Id.* ¶ 12. In January 2011, Mr. Peters was hired to oversee construction on several projects in Libya. ECF No. 19-1 ¶ 12. Mr. Peters had been in Libya for approximately one month when protests against Muammar Qadhafi began spreading as part of the Arab Spring movement, which led to open hostilities and civil war in Libya as of February 17, 2011. ECF No. 19 ¶ 19.
>
> 1. Detention
>
> Following the outbreak of hostilities, Mr. Peters called Ms. Peters from Tripoli on March 2, 2011, and informed her that he would leave Libya. *Id.* ¶¶ 22–23. On March 3, 2011, Mr. Peters attempted to drive to Egypt, but was turned away from one of the several Libyan military checkpoints set up outside Tripoli. *Id.* ¶¶ 25–26.

3

The Libyan military forces then followed him, pulled him over, and took him hostage, seizing all his possessions. *Id.* ¶¶ 26–27. Mr. Peters was blindfolded and taken to a 7-by-8-foot concrete and steel jail cell. *Id.* ¶¶ 28–29. The cell was infested with insects and had no running water; he was given only a mattress and a blanket. *Id.* Meanwhile, back in Idaho, Ms. Peters contacted the offices of Idaho's senators and the United States Department of State to inform them of her husband's situation. *Id.* ¶¶ 32–33. Libyan government officials "would not confirm or deny that they were holding Mr. Peters, that he was alive, or that they even knew of his existence." *Id.* ¶ 35.

After two weeks, Mr. Peters was blindfolded, handcuffed, placed in a paddy wagon with six other people, and taken to Maftua Prison in Tripoli, which was allegedly under Defendants' control at that time. *Id.* ¶ 39. When he arrived, Mr. Peters believed he was "going to be placed . . . facing [a] wall and shot in the back of the head." ECF No. 19-1 ¶ 27. Instead, he was taken to a cell infested with rats, roaches, spiders, and lice, where he was kept in solitary confinement over the next several months. *Id.* ¶¶ 28–29. Mr. Peters states that Libyan soldiers discovered that he was a former U.S. Navy SEAL and accused him of being a spy sent to free other Americans. *Id.* ¶ 29. As "a man of strong faith," Mr. Peters states he sustained himself throughout this period by reading a small pocket Bible one of the guards had given him. *Id.* ¶ 30. During Mr. Peters' captivity, temperatures would fluctuate between 80 and over 100 degrees outside his cell and he "felt like [he] was being cooked alive." *Id.* ¶ 31. He was routinely denied water and given only rotten food to eat, and eventually the malnutrition caused his gums to bleed, he lost over 100 pounds, and his body was covered in "open, festering sores." *Id.* ¶ 32. Mr. Peters states that he was interrogated multiple times and recalls at least "three instances of torture lasting approximately three to six hours each time," with another three instances of being "tortured for at least ten hours each time." *Id.* ¶¶ 32–33. Throughout those interrogations, Mr. Peters was "handcuffed, blindfolded, kicked, and beaten repeatedly" and "threatened with death in an effort to coerce a confession that [he] was operating as an American spy." *Id.* ¶ 34. He was also "forced to take lie-detector tests at gunpoint" and states that he "lived each day not knowing whether it would be [his] last." *Id.*

As a result of these interrogations and denial of medical treatment, Mr. Peters suffered from infections, high fevers, intense pain, and delirium. *Id.* ¶ 35. At one point he had an ear infection that was so painful he could not open or close his mouth and he was given only a straw to try and "clear the blood and puss from [his] infected ear." *Id.* Mr. Peters also states that "several times [he] felt like [he] was having a heart attack." *Id.* At several points during his detention, Mr. Peters could "hear the pleas and screams of other prisoners as they were being tortured," and while listening to them, his captors would routinely threaten to execute him. *Id.* ¶ 36.

Months into his detention, Mr. Peters was given a phone by Libyan soldiers told to call President Obama and denounce America, but instead he called his wife. *Id.*

¶ 40.  By early August 2011, the guards further cut the amount of food he received, giving him only "some rotten dates and a warm carton of rotten milk once a day." *Id.* ¶ 42.  He was told that he would be hanged in Martyr's Square on September 1, 2011.  *Id.* ¶ 43.

2. Escape and Post-Escape

On August 20, 2011, Mr. Peters heard a commotion outside of the prison; he climbed to the small window in his cell where he saw through a crack several guards rushing from the prison.  *Id.* ¶¶ 44–45.  After ten minutes, Mr. Peters began banging and kicking the door to his cell, and once he was certain all the guards had left, he began drop-kicking the door until it separated from the wall.  *Id.* ¶¶ 46–47.  Mr. Peters was then able to free the remaining prisoners before making his way to an abandoned building to hide.  *Id.* ¶ 48.  A group of men found him in the building, and after a "brief, tense standoff in which [he] feared for his life," Mr. Peters learned that they were anti-Qadhafi rebels, and one of them took Mr. Peters home and fed him.  *Id.* ¶ 49.  The next day, Mr. Peters called his wife and let her know he was alive and had escaped.  *Id.* ¶ 50.

Mr. Peters stayed with a Libyan family for a couple of weeks until he applied for an exit visa with the National Transitional Council, the de facto Libyan government during and immediately after the uprising and fall of Qadhafi in October 2011.[2]  *Id.* ¶¶ 51–52.  Mr. Peters was assigned number forty-four on the exit visa list; however, it took him more than two years for him to leave Libya.  *Id.* ¶¶ 52–53.

After Mr. Peters returned to the United States, he continued to suffer from his experience.  Prior to his detention, Mr. Peters was 265 pounds and in excellent physical condition.  *Id.* ¶ 25.  Now, he suffers from severe tinnitus and impaired hearing (as a result of the ear infection); heart problems requiring the implantation of a stent and pacemaker (as a result of malnutrition and the beatings); hip, leg, back, and knee problems that required him to use cane to walk (as a result of the beatings); and stage three chronic kidney disease (as a result of the malnutrition).  *Id.* ¶ 54.  In addition to the physical toll, his captivity meant he missed out on family events, including his daughter's wedding in August 2011.  *Id.* ¶ 55.  His imprisonment also caused his "contracting business [to fall] apart in [his] absence," and his family to lose their homes because his wife was unable to pay the mortgage.  *Id.* ¶¶ 56, 58.

Mr. Peters also suffered emotional injury as a result of his captivity and torture. The emotional trauma "took a toll on [his] marriage and [his] relationship with [his] family," and Mr. and Ms. Peters divorced in 2020.  *Id.* ¶ 59; ECF No. 19 ¶ 145.

Report and Recommendation, ECF No. 22, at 2–7.

---

[2] Qadhafi was killed on October 20, 2011.  ECF No. 5 ¶ 8.

Two other background facts are relevant to the resolution of Plaintiffs' Objections to the Report and Recommendation.

*First*, Plaintiffs allege that Muammar and Saif Qadhafi "employed or caused to be employed and controlled those members of the Libyan security and military forces that were responsible for the kidnapping, detainment and torture of Plaintiff, Richard Peters." Am. Compl. ¶¶ 9, 11. They also allege that Muammar and Saif Qadhafi "were under command and control of official Libyan security forces and military forces" at all times relevant to this case. *Id.* ¶ 13.

*Second*, On February 25, 2011, President Barack Obama issued an Executive Order declaring that Muammar Qadhafi's actions constituted "an unusual and extraordinary threat to the national security and foreign policy interests of the United States." Exec. Order 13,566, 76 Fed. Reg. 11315 (Feb. 25, 2011). In response to this threat, the President declared a national emergency, ordered the seizure of certain assets, and ordered the imposition of sanctions on members of the Qadhafi family. *Id.*

## II. LEGAL STANDARD

When a party files timely objections to a Magistrate Judge's Report and Recommendation, this Court reviews *de novo* those portions of the Report and Recommendation to which a party has objected. LCvR 72.3(c). This Court may then "accept, reject, or modify, in whole or in part, the findings and recommendations" of the Magistrate Judge. *Id.*

## III. ANALYSIS

### A. Jurisdictional Framework

Before entering a default judgment against an absent defendant, the Court must have personal jurisdiction over the defendant. *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). Unless the Court elects to hold an evidentiary hearing on the issue, all that is required is "a *prima facie* showing of personal jurisdiction by the plaintiffs." *Id.* When evaluating whether plaintiffs

have made this showing, the Court "need not confine itself to only the allegations in the complaint." *Frost v. Cath. Univ. of Am.*, 960 F. Supp. 2d 226, 231 (D.D.C. 2013) (RCL), *aff'd*, 555 F. App'x 6 (D.C. Cir. 2014).  Instead, plaintiffs "may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Mwani*, 417 F.3d at 7.  There is no requirement for "evidence that meets the standards of admissibility" ordinarily demanded by the Federal Rules of Evidence.  *Id.*  However, conclusory allegations are not sufficient; instead, "a plaintiff must allege specific acts connecting [the] defendant with the forum."  *Second Amend. Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001) (alteration in original) (quoting *First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988)).

Personal jurisdiction requires three things: "authorization for service of summons on the defendant," effective service of the summons, and a "constitutionally sufficient relationship between the defendant and the forum."  *Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987).

The most familiar means of establishing the first and third requirements for personal jurisdiction is to determine "whether an applicable long-arm statute . . . would authorize service on the defendants" and "whether the application of such a statute would comply with the demands of due process."  *Mwani*, 417 F.3d at 8.  But here, as Magistrate Judge Harvey correctly concluded, the relevant long-arm statute does not reach the Defendants because they have not engaged in any relevant conduct in this District.  *See* R&R at 9 (citing D.C. Code § 13–423(a)(4)).

Plaintiffs therefore rely instead on Federal Rule of Civil Procedure 4(k)(2), which allows federal courts to exercise personal jurisdiction over a defendant, without regard to the forum's long-arm statute, (1) for a claim arising under federal law, (2) where a summons has been served,

7

(3) if the defendant is not subject to the jurisdiction of any single state court, (4) provided that the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States." *Mwani*, 417 F.3d at 10.

Plaintiffs meet the first three predicates of the rule. First, their claims arise under a federal law, the Torture Victims Protection Act ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note). Second, they have served Defendants by publication under Federal Rule of Civil Procedure 4(f)(3). Third, Defendants are not subject to the jurisdiction of in any single state court.

The crux of the jurisdictional issue in this case is therefore whether it is "consistent with the Constitution (and laws) of the United States," including the Due Process Clause of the Fifth Amendment, for this Court to exercise personal jurisdiction over the Defendants. *See* Fed. R. Civ. P. 4(k)(2).

Magistrate Judge Harvey concluded that the Fifth Amendment forbids the exercise of personal jurisdiction here because the Defendants do not have "constitutionally sufficient contacts with 'the United States as a whole.'" Report and Recommendation, ECF No. 22, at 11, 23 (quoting *Mwani*, 417 F.3d at 6). Applying Circuit precedent, Judge Harvey conducted this Fifth Amendment "contacts" inquiry using the same "minimum contacts" framework that applies, under the Fourteenth Amendment, to the question of whether there are sufficient contacts among the defendant, the controversy, and the forum to make the exercise of specific personal jurisdiction in a *state* court consistent with "traditional notions of 'fair play and substantial justice.'" *See Livnat v. Palestinian Auth.*, 851 F.3d 45, 48, 54–55 (D.C. Cir. 2017) (quoting *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 320 (1945)).

8

In a recent decision, the U.S. Court of Appeals for the D.C. Circuit acknowledged that "the Supreme Court has yet to explicitly consider whether the Fifth Amendment's Due Process Clause requires the same minimum contacts to establish specific jurisdiction as under the Fourteenth Amendment."[3] *Lewis v. Mutond*, 62 F.4th 587, 591 (D.C. Cir. 2023). However, after canvassing decisions from other circuits, it concluded that "little jurisdictional daylight exists between the two amendments." *Id.* at 592 & n.2 (collecting cases). Although it acknowledged "exceptions," such as cases involving "sovereign foreign states" that are not subject to the protections of the Fifth Amendment, it concluded that cases involving "foreign persons" do not fall within those limited exceptions. *Id.* at 592. It therefore proceeded to apply precedents based on the Fourteenth Amendment "minimum contacts" framework to decide whether exercising specific personal jurisdiction over foreign individuals under Rule 4(k)(2) was consistent with the Fifth Amendment's Due Process Clause. *See id.* at 591–94. This Court shall follow suit here.

Under the "minimum contacts" framework, whether personal jurisdiction is constitutionally permissible under Rule 4(k)(2) "depends on whether a defendant has sufficient contacts with the United States as a whole to justify the exercise of personal jurisdiction." *Mwani*, 417 F.3d. at 11. That inquiry focuses on the "relationship among the defendant, the forum, and the litigation." *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court,* 592 U.S. 351, 365 (2021) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). The

---

[3] The Supreme Court may have occasion to consider the issue soon. After Magistrate Judge Harvey issued his Report and Recommendation, the Court granted certiorari in *Fuld v. Palestine Liberation Organization*, No. 24-20, in which the Petitioner argues that the Fifth Amendment Due Process Clause does not limit federal courts' ability to exercise personal jurisdiction in cases arising from conduct outside the United States. *See* Brief for Petitioner at 17–29, *Fuld v. Palestine Lib. Org.*, No. 24-20 (cert. granted Dec. 6, 2024). This Court considered staying proceedings, *sua sponte*, pending a decision in *Fuld*. *See Hisler v. Gallaudet Univ.*, 344 F. Supp. 2d 29, 35 (D.D.C. 2004) (RMU) (explaining that in some cases, a stay may be both "efficient" and "the fairest course for the parties"). However, the claim in *Fuld* is based on a statute providing that a defendant "shall be deemed to have consented to personal jurisdiction" under narrow conditions not at issue here. *See id.* at 3–4; § 2334(e)(1). It is therefore far from certain that the Supreme Court's decision will illuminate the issues before this Court in this case, and a stay pending that decision is not warranted.

relevant contacts must be "purposefully directed" at the forum and establish "foreseeability . . . that the defendant's conduct and connection with the forum . . . are such that he should reasonably anticipate being haled into court there." *Burger King v. Rudzewicz*, 471 U.S. 462, 474 (1985) (first quoting *Keeton v. Hustler Magazine*, 465 U.S. 770, 774 (1984); and then quoting *World-Wide Volkswagen Corp. v. Woodson*, 446 U.S. 286, 297 (1980)).  The relevant contacts are those "that the 'defendant *himself*' creates with the forum" through his own conduct; "the plaintiff cannot be the only link between the defendant and the forum."  *Walden v. Fiore*, 571 U.S. 277, 284–85 (2014) (emphasis in original) (quoting *Burger King*, 471 U.S. at 475).  Instead, for specific personal jurisdiction to attach, a plaintiff's claims must "aris[e] out of or relat[e] to" the defendant's contacts with the forum itself.  *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255 (2017) (alterations in original) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014)).  In short, "the defendant's suit-related conduct must create a substantial connection with the forum."  *Walden*, 571 U.S. at 284.  When a decedent's estate is a defendant, as is true in this case, courts consider the decedent's contacts during his during his lifetime to decide whether these standards are satisfied.  *See Willis v. Willis*, 655 F.2d 1333, 1335, 1337–39 (D.C. Cir. 1981).

The jurisdictional analysis here therefore turns on whether there is a constitutionally sufficient relationship among Muammar and Saif al-Islam Qadhafi, their conduct as alleged in the Plaintiffs' Amended Complaint, and "the United States as a whole" to justify this Court's exercise of personal jurisdiction.  *See Mwani*, 417 F.3d. at 11; *Ford Motor Co.,* 592 U.S. at 365.

B.     **Defendants' Alleged Contacts with the United States**

Magistrate Judge Harvey concluded that the contacts alleged in this case are not sufficient to establish personal jurisdiction over the Defendants. This Court agrees with Magistrate Judge Harvey's conclusion and will therefore dismiss this case.[4]

Plaintiffs do not dispute that all the relevant conduct occurred in Libya, not the United States. *See* Am. Compl. ¶¶ 19–35. And under binding precedent, the fact that the Plaintiffs are citizens and residents of the United States does not, without more, give this court personal jurisdiction over their suit. *See id.* ¶¶ 4–5; *Walden*, 571 U.S. at 285 ("[T]he plaintiff cannot be the only link between the defendant and the forum."); *Lewis*, 62 F.4th at 593 ("[T]orture alone of an American abroad, unless directed at the United States, is 'insufficient to satisfy the usual "minimum contacts" requirement.'" (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95 (D.C. Cir. 2002)).

The question for the Court is therefore whether the Plaintiffs' allegations sufficiently establish that their injuries arise from actions that Defendants "directed . . . specifically at the United States." *Lewis*, 62 F.4th at 595.

Plaintiffs proffer several facts that they argue support an inference that Defendants caused Mr. Peters to be captured and tortured because of his connection with the United States, under circumstances that made it foreseeable that they would be haled into a federal court of this country. Specifically, they assert that Libyan forces captured, detained, and tortured Mr. Peters "only after President Obama declared a national emergency and issued [an executive order] blocking Defendants' property and assets in the United States." Pls.' Objs. at 14; Am. Compl. ¶¶ 16, 42;

---

[4] Because the Court concludes that it lacks personal jurisdiction over the Defendants, it does not reach the question of whether it has subject-matter jurisdiction. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007).

11

Affidavit of Richard Peters ("R. Peters Aff."), ECF No. 20-1 (under seal), ¶¶ 17–21. They also allege that Mr. Peters's captors accused him of being an American spy sent to Libya to free Americans. Am. Compl. ¶ 31; R. Peters Aff. ¶¶ 29, 34. They further assert that Mr. Peters's captors called him "the American" or the "human frog," referring to his service as a Navy SEAL (colloquially, a "frogman"). R. Peters Aff. ¶ 37. Finally, the Plaintiffs allege that, months into his imprisonment, Mr. Peters's captors gave him a phone and told him "to call President Obama and denounce America." R. Peters Aff. ¶ 40. (Mr. Peters called his wife, instead. *Id.*)

In their Objections, Plaintiffs summarize the inference they urge the Court draw from this evidence: "Defendants purposefully targeted a citizen of the United States, in response to an Executive Order of the President of the United States, in an effort to extract leverage over the United States." Pls.' Objs. at 13.

But Plaintiffs' own conclusion that Defendants' "motivation was against the United States" is not sufficient to establish personal jurisdiction. *Lewis*, 62 F.4th at 594. If the rule were otherwise, parties could circumvent the constitutional limits on federal courts' personal jurisdiction by "merely stat[ing] [their] theory of specific jurisdiction" as allegations in their complaints. *See id.* (first alteration in original) (quoting *Livnat*, 851 F.3d at 57).

Instead, the Plaintiffs have the burden of plausibly alleging facts that, if proven, would show that that Defendants "meant to avail themselves of the United States" when they engaged in the wrongful conduct at issue. *Lewis*, 62 F.4th at 594. Their allegations fall short of this mark.

First, the Plaintiffs have not alleged facts that establish a causal connection between the Defendants' alleged actions and the President's Executive Order. The fact that Libyan forces captured Mr. Peters soon after the President issued the Executive Order does not, without more, establish that connection. *See Env't Integrity Project v. United States Env't Prot. Agency*, 316 F.

Supp. 3d 320, 326 (D.D.C. 2018) (JDB) ("[A] plaintiff must do more than claim *post hoc, ergo propter hoc* ('after this, therefore because of this') to prove that a causal nexus exists."). The Plaintiffs have not alleged that the Defendants personally directed their forces to take any action against Americans in general in response to this Executive Order, let alone against him in particular. Indeed, the Plaintiffs have not alleged that either Muammar or Saif al-Islam Qadhafi The Plaintiffs' inference that the Defendants "took Mr. Peters hostage to retaliate against the United States" for the Executive Order therefore lacks sufficient support in the record to provide a basis for this Court to exercise personal jurisdiction over the Defendants. *See* Pls.' Objs. at 14.

Second, in the absence of allegations that the Defendants personally directed Libyan forces to retaliate against Americans, the Plaintiffs' allegations about Mr. Peters's captors' actions are insufficient to support this court's personal jurisdiction over the Defendants. The Plaintiffs argue that under the doctrine of *respondeat superior*, the Court should consider the actions of Mr. Peters's captors when determining whether it has personal jurisdiction over the Defendants. Pls.' Objs. at 16–17 (citing *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 265 (D.D.C. 2004) (RMC)). Because Mr. Peters's captors were allegedly members of Libyan security forces under the Defendants' command, the Plaintiffs argue that those individuals' conduct is attributable to the Defendants for purposes of the personal jurisdiction analysis. *Id.* But Plaintiffs have not offered any authority for the proposition that *respondeat superior* liability allows a federal court to exercise personal jurisdiction over a *de facto* leader of a foreign state based on a foreign officer's conduct, and as Magistrate Judge Harvey correctly concluded, the weight of authority is to the contrary. *See, e.g.*, *Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48, 73 (D.D.C. 2013) (BAH), *aff'd*, 782 F.3d 9 (D.C. Cir. 2015); *Duong v. N. Am. Transportation Servs. LLC*, No. 2:17-cv-01089-DCN, 2019 WL 13109647, at *7 (D.S.C. Sept. 25, 2019); *see also* R&R at 21–22 &

13

nn.6–7. Actions taken by officers or agents of a foreign state do not give rise to specific personal jurisdiction against leaders of that state unless a plaintiff has plausibly alleged "the *personal involvement of*" the individual leaders in the challenged conduct. *See Mohammadi*, 947 F. Supp. 2d at 73. In this context, as in every other, the relevant contacts are those "that the '*defendant himself*' creates" through his own conduct, not those of third parties. *Walden*, 571 U.S. at 284 (emphasis in original) (quoting *Burger King*, 471 U.S. at 475).

Plaintiffs rely heavily on *Mwani v. bin Laden*, 417 F.3d 1 (D.C. Cir. 2005), in which the D.C. Circuit concluded that it was proper for a court of this District to exercise specific jurisdiction over two foreign defendants based on actions taken outside the United States. *See* Pls.' Objs. at 12–13, 15–16. However, as the Plaintiffs recognize, the jurisdictional facts underlying the decision in *Mwani* were profoundly different from those of this case. *See id.* at 16 n.104.

The plaintiffs in *Mwani* were victims and relatives of victims of the August 1998 bombing outside the U.S. embassy in Nairobi, Kenya. *See* 417 F.3d at 4. The plaintiffs sued Osama bin Laden and al Qaeda, alleging that they had orchestrated the attack.[5] *Id.* The D.C. Circuit concluded that the plaintiffs' allegations and evidence showed that "bin Laden and al Qaeda orchestrated the bombing of the American embassy in Nairobi, not only to kill both American and Kenyan employees inside the building, but to cause pain and sow terror in the embassy's home country, the United States." *Id.* at 13. Further, the plaintiffs showed that bin Laden and al Qaeda's contacts with the United States were not "limited to the Nairobi bombing." *Id.* On the contrary, the plaintiffs situated the Nairobi attack in the context of "an ongoing conspiracy to attack the United States, with overt acts occurring within this country's borders." *Id.* On this record, there was "no doubt" that there was a sufficient connection between bin Laden and al Qaeda's alleged

---

[5] The *Mwani* plaintiffs also sued Afghanistan, alleging that it provided logistical support to bin Laden and al Qaeda's efforts, but the Foreign Sovereign Immunities Act barred the claim against Afghanistan. *See* 417 F.3d at 4.

14

conduct and the United States to permit a court of this District to exercise personal jurisdiction over these defendants.

In this case, by contrast, the Plaintiffs have not plausibly alleged either that the Defendants acted with the purpose of causing pain and terror within the United States or that their actions were part of a conspiracy that included other acts purposefully directed against the United States. The Plaintiffs correctly note that Muammar Qadhafi was previously haled into federal court in this District to answer for his role in the 1989 bombing of an airplane carrying people of many nationalities, including several Americans. Pls.' Objs. at 15 (citing *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54, 56 (D.D.C. 2003) (TPJ)). But the Plaintiffs have not alleged facts that plausibly show that Mr. Peters's capture, detention, and torture arose from the same conspiracy as this or any other act of terrorism committed beyond Libya's borders. Although their allegations and evidence do plausibly establish that Libyan forces singled out Mr. Peters for mistreatment because he is an American, that fact alone is insufficient to support this Court's personal jurisdiction over the Defendants.

This case is more similar to *Lewis v. Mutond*, 62 F.4th 587 (D.C. Cir. 2023), in which the D.C. Circuit declined to extend *Mwani* and affirmed a dismissal for lack of personal jurisdiction. The plaintiff in that case, Darryl Lewis, was a security advisor to a former presidential candidate in the Democratic Republic of the Congo. 62 F.4th at 589. Mr. Lewis, like Mr. Peters, alleged that he was detained and tortured by officers of a foreign government. *Id.* at 590. Mr. Lewis's captors accused him of being an American mercenary and being part of a plot among American and South African citizens to destabilize the government. *Id.* at 594. He argued that his captors held and tortured him in an attempt "to entangle the United States in a geopolitical conflict." *Id.*

15

The D.C. Circuit held that none of Mr. Lewis's arguments or evidence established that the foreign officials who he named as defendants had "meant to avail themselves of the United States" in a manner sufficient to support the exercise of personal jurisdiction. *Lewis*, 62 F.4th at 594. The court explained that mere fact that a plaintiff "concludes that [the defendants'] motivation was against the United States" is insufficient, even when supported by evidence that the defendants have taken actions against Americans in the past. *Id.* It therefore affirmed the dismissal of Mr. Lewis's case. *Id.* at 596.

Similarly, in *Livnat v. Palestinian Authority,* 851 F.3d 45 (D.C. Cir. 2017), the D.C. Circuit held that personal jurisdiction was lacking in a case brought against the Palestinian Authority by victims and relatives of victims of a 2011 attack at on Jewish worshippers at a holy site in the West Bank. 851 F.3d at 46–47, 56–57. The plaintiffs had alleged that "the attack was 'part and parcel of' the Palestinian Authority's 'general practice of using terrorism to influence United States public opinion and policy' and was 'intended, through intimidation and coercion, to influence the Israeli and United States government's policies.'" *Id.* at 57 (quoting the plaintiffs' complaint). The plaintiffs also produced a declaration from a professor asserting that "the Palestinian Authority encourages terrorism against Jews and Israeli in order to influence U.S. policy in the Palestinian Authority's favor." *Id.* But the D.C. Circuit concluded that the plaintiffs' allegations and evidence were insufficient to establish personal jurisdiction over the Palestinian Authority because the plaintiffs did not allege or establish specific facts supporting an inference that the attack giving rise to *their* claim was intended to influence U.S. policy. *Id.*

Recently, in *Farah v. Government of the Republic of Somaliland*, No. 23-cv-1205, 2024 WL 3985165 (D.D.C. August 29, 2024), Judge Ana C. Reyes addressed similar issues in a TVPA case arising from acts of torture and summary execution allegedly committed by the Republic of

Somaliland and two of its high officials.[6] The plaintiff in that case, the son of an alleged victim, asserted that the individual defendants in the case had ordered government troops to "target, attack, torture, murder, and subjugate" civilian residents of the city of Las Anod, specifically targeting people "with United States citizenship or legal residency." *Id.* at *1, *6 (quoting the plaintiff's complaint). The plaintiff also proffered social media posts and news articles that he argued supported his theory that U.S. citizens and residents had been targeted. *Id.* at *6–8. Analogizing to the D.C. Circuit's decision in *Lewis*, Judge Reyes concluded that the plaintiff's allegations and evidence were insufficient to show that the individual defendants had sufficient connections with the United States to support the exercise of personal jurisdiction in this District. *Id.* at *7–8. Under *Lewis*, she explained, "[c]onclusory allegations of parties' targeting U.S. citizens for mistreatment do not, without supporting detail, establish personal jurisdiction." *Id.* at *7.

The clear principle that emerges from cases like *Lewis*, *Livnat*, and *Farah* is that personal jurisdiction over a foreign individual requires more than circumstantial evidence suggesting the possibility that a defendant's challenged conduct was directed at the United States. *See Lewis*, 62 F.4th at 594–96; *Livnat*, 851 F.3d at 56–57; *Farah*, 2024 WL 3985165 at *7–8. Plaintiffs must allege something more that supports a plausible inference that the defendants purposefully targeted the United States. In *Mwani*, the plaintiffs carried that burden by alleging that the attack giving rise to their injuries was targeted at a U.S. embassy, was intended to sow terror in the United States, and was part of "an ongoing conspiracy to attack the United States, with overt acts occurring within this country's borders." 417 F.3d at 13.

Plaintiffs' best evidence of "something more" in this case is their evidence that Mr. Peters was detained soon after President Obama issued an Executive Order targeting the Qadhafi regime

---

[6] As Judge Reyes explained, the Republic of Somaliland is "a self-declared breakaway state in East Africa whose legal status the parties vigorously dispute." *Farah*, 2024 WL 3985165, at *1.

17

and, later, directed by his captors to "to call President Obama and denounce America." Am. Compl. ¶¶ 16, 42; R. Peters Aff. ¶ 40. These allegations make this case a closer one than *Lewis*, *Livnat*, or *Farah* because they could support an inference that some of the alleged conduct was purposefully directed at the United States. However, they are ultimately insufficient to support this Court's personal jurisdiction over the Defendants because they do not show that either Defendant "*himself*" took any action toward the United States in connection with the ordeal that Mr. Peters endured. *See Walden*, 571 U.S. at 284 (emphasis in original) (quoting *Burger King*, 471 U.S. at 475). Because the personal jurisdiction inquiry turns on the Defendants' own actions, not those of their subordinates, the absence of any plausible allegation or evidence that the Defendants personally directed the alleged capture, detention, and torture of Mr. Peters precludes a contrary conclusion.

\* \* \*

The Plaintiffs' allegations and evidence show that Libyan forces inflicted terrible suffering on Mr. Peters and his family. However, because this Court lacks jurisdiction to adjudicate the claims presented against the two named Defendants, it must dismiss this case.

## IV. CONCLUSION

For the foregoing reasons, the Court shall **OVERRULE** Plaintiffs' [23] Objections, **ADOPT** the [22] Report and Recommendation, **DENY** Plaintiffs' [18] Renewed Motion for Default Judgment, and **DISMISS** this action **WITHOUT PREJUDICE** for lack of personal jurisdiction over Defendants. An appropriate Order accompanies this Memorandum Opinion.

**Dated:** March 17, 2025



COLLEEN KOLLAR-KOTELLY
United States District Judge